IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 22, 2009 Session

# THE HAMILTON-RYKER GROUP, LLC
v.
# TAMMY L. KEYMON

### Appeal from the Chancery Court for Weakley County
No. 18946     W. Michael Maloan, Chancellor

No. W2008-00936-COA-R3-CV - Filed January 28, 2010

This appeal involves a noncompete agreement and the Trade Secrets Act. The defendant employee worked for fourteen years for the plaintiff employer. The employee executed a covenant not to compete, prohibiting the employee from soliciting the employer's clients for one year after termination. During her employment, the employee became the contact person for a particular customer. The defendant employee was temporarily laid off. The day after the layoff, the employee and the customer entered into an arrangement under which the laid off employee performed the same work for the customer that the employer had been performing. The employee then emailed numerous documents related to the customer from her work email address to her personal email address. After that, the customer ended the business relationship with the plaintiff employer. Subsequently, the employer sued the employee for, *inter alia*, breach of contract, misappropriation of confidential information, and violation of Tennessee's Trade Secrets Act. The trial court entered judgment for the employer on all counts; the damages award included over $900,000 as doubled damages under the Trade Secrets Act. The employee now appeals. We affirm, finding that the covenant not to compete was enforceable despite the lack of any territorial limitation, that the information emailed to the employee's personal email was a trade secret, and that the evidence supports the award of damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Gregory W. Minton and Brandon Newman, Medina, Tennessee, for the appellant, Tammy L. Keymon.

Gregory D. Jordan and W. Paul Whitt, Jackson, Tennessee, for the appellee, The Hamilton-Ryker Group, LLC.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Appellant/Defendant Tammy L. Keymon[1] ("Keymon") began working for the predecessor-in-interest of Appellee/Plaintiff Hamilton-Ryker Group, LLC ("Hamilton-Ryker") in 1990. Hamilton-Ryker[2] is a human resources company that provides labor services to its clients. As such, Hamilton-Ryker has an internal staff for its own operations, and a stable of employees whose services are made available to clients for a variety of needs, such as temporary employees, staff for special projects, and ongoing operations. Keymon was a member of Hamilton-Ryker's internal staff.

Initially, Keymon served as a Service Specialist in Hamilton-Ryker's Martin, Tennessee office. Her duties consisted of coordinating applicant, employee, and customer services in the industrial and clerical temporary service division of Hamilton-Ryker's operations. Over time, Keymon's duties grew to encompass supervision of Hamilton-Ryker's operations in Memphis, Tennessee, as well as its facilities in Mount Juliet and La Vergne, Tennessee.

When Keymon was hired in 1990, she executed an employment agreement with Hamilton-Ryker that included a noncompete covenant and a confidential information clause. Over the term of Keymon's fourteen-year employment with Hamilton-Ryker, the company changed its legal organization by merging with, and then disassociating from, other labor services companies. Each time that Hamilton-Ryker changed legal form, Hamilton-Ryker's employees, including Keymon, executed new employment agreements.[3] Every employment agreement signed by Keymon included a noncompete covenant and a confidential

---

[1]Keymon is represented by a different attorney on appeal than the attorney who represented her at trial.

[2]In this Opinion, we will use the term "Hamilton Ryker" to include its predecessors in interest.

[3]The record includes employment agreements executed by Keymon on four dates: October 26, 1990, April 4, 1994, January 4, 1996, and November 26, 2001.

information clause. The operative employment agreement for this appeal, executed in late 2001 ("Employment Agreement"), included the following provisions:

2. **CONFIDENTIALITY.** The Employee acknowledges that in the Staffing Services Business customer information developed by providers, including the Employer is an extremely valuable business asset, which providers, including the Employer, treat as trade secrets by limiting access to such customer information to those employees who have a need to know. Such customer information consists of customer lists, staffing needs of customers, special staffing needs of customers, customer contacts, customer staffing history and all aspects of the Employer's pricing policies and strategies with respect to customers (collectively "Confidential Information").

To protect the Employer's Confidential Information, the Employee agrees at all times, both during and after termination of his employment with Employer to keep and retain in strict confidence all of the Employer's Confidential Information. The Employee further agrees that all Confidential Information will be used solely for the benefit of the Employer and not for the personal benefit of the Employee or any other person or entity, including the Employer's competitors.

. . . .

3. **COVENANT NOT TO COMPETE**. Employee agrees that, during the period of his employment with Employer and for one (1) year thereafter, the Employee will not, directly or indirectly, for himself or for any other person or business entity:

(a) Solicit, cause or authorize to be solicited, for and on behalf of himself or third parties, any Staffing Services Business from any parties who are then customers of the Employer; or

(b) Solicit, cause or authorize to be solicited, for and on behalf of himself or third parties, any Staffing Services Business from any parties who are then customers of the Employer with whom the Employee did business on behalf of the Employer; or

(c) Solicit, cause or authorize to be solicited, for and on behalf of himself or third parties, any Staffing Services Business from any parties who are then customers or prospective customers of the Employer with respect to whom the Employee acquired Confidential Information from the Employer; or

(d) Solicit, cause or authorize to be solicited, on behalf of himself or third parties any employee of the Employer to terminate his employment relationship with the Employer or otherwise accept employment with another employer.

Keymon began supervising Hamilton-Ryker's Memphis facility sometime in 1996. At the time, Hamilton-Ryker's Memphis operation primarily consisted of providing "dot prep" services to Federal Express. Keymon supervised some 150 Hamilton-Ryker employees in manually preparing air bills for Federal Express's shipping business. In late 2002 or early 2003, Hamilton-Ryker learned that it was going to lose the Federal Express account. Rather than close the Memphis location, Hamilton-Ryker hired a sales representative to solicit new clients for the Memphis facility. The sales associate acquired enough new clients for Hamilton-Ryker's Memphis operation to keep it open. Keymon remained in charge of supervising the Memphis facility.

Among the new clients solicited for Hamilton-Ryker's Memphis facility was Mark Hoing ("Hoing"). Hoing owned his own company, Oasis, Incorporated ("Oasis"). Oasis' business consisted of providing shipping services to its nearly one hundred and fifty clients. Oasis's clients included communications provider Verizon Communications, Inc. (Verizon"). Oasis had a contract with Verizon to deliver Verizon's telephone directories to individual Verizon customers. The telephone directories had to be prepared for delivery by attaching mailing labels, and Oasis was not set up to do this task. Consequently, Oasis sought to find a vendor to prepare Verizon's directories for delivery. When contacted by Hamilton-Ryker's sales representative in 2003, Hoing determined that Hamilton-Ryker was capable of providing the needed mailing preparation service. Hoing then informed his contact at Verizon, Terri Janak ("Janak"), of Hamilton-Ryker's interest in the work. Together, Hoing and Janak decided to hire Hamilton-Ryker to attach the mailing labels to Verizon's directories. The arrangement among Oasis, Verizon, and Hamilton-Ryker was verbal and for no stated term.

In the summer of 2003, Hamilton-Ryker's Memphis facility began attaching Verizon's labels to its telephone directories. The work was done on a project-by-project basis, with each project focused on a specified geographic area. Keymon supervised Hamilton-Ryker's employees and was Hamilton-Ryker's contact person with both Verizon and Oasis. For each group of directories to be shipped, a Verizon employee would email Keymon documents containing the mailing addresses and the number of phone directories to be processed. The emailed mailing addresses would then be reformatted, using Hamilton-Ryker's computer software program, in a manner that permitted the mailing addresses to be printed as mailing labels. Oasis would deliver the Verizon directories to the Memphis location, and Hamilton-Ryker employees would then attach the labels to the directories. Thereafter, Oasis would pick up the labeled directories and deliver them to the appropriate addresses. After completion of each project, Keymon would send a Hamilton-Ryker invoice directly to Verizon, and Verizon would send its payment directly to Hamilton-Ryker, without going through Oasis. Thus, while Oasis was a "gatekeeper" to Verizon, Hamilton-Ryker also had a direct relationship with Verizon.

For each project, Hamilton-Ryker was paid by the number of Verizon telephone directories that it processed. As such, Hamilton-Ryker's revenues from its work for Verizon fluctuated. At one point, Keymon prepared an analysis for Hamilton-Ryker showing that, on average, the Memphis facility's work for Verizon generated a net profit of 32.9% of the amounts billed to Verizon.

During the remainder of 2003, the arrangement among Hamilton-Ryker, Oasis and Verizon continued successfully. Hamilton-Ryker contacted Verizon about doing all of Verizon's directory preparation work in 2004. As a result of those discussions, Verizon emailed Hamilton-Ryker its production schedule for all of 2004. Hamilton-Ryker's directory processing work for Verizon continued in 2004 on a project-by-project basis.

Meanwhile, in the early summer of 2004, Hamilton-Ryker decided to do a re-organization that included elimination of Keymon's job position. However, Hamilton-Ryker considered Keymon to be a valuable employee and wanted to retain her. In addition, Hamilton-Ryker was aware that Keymon wanted to reduce her work-related travel. Therefore, in June 2004, Hamilton-Ryker officers offered Keymon a new position as a Special Projects Manager at the same salary she had been receiving. The Hamilton-Ryker officers told Keymon that the newly-created position would allow her to be more efficient and would decrease the amount of travel required of her. Keymon, however, believed that the new position would require even more travel, and she perceived it to be a "step backwards" in her career. Although Hamilton-Ryker tried to persuade Keymon to accept the new Special Projects Manager position, she decided to reject it. Keymon's email to the Hamilton-Ryker officers, rejecting the offer of the new position, stated that she did not intend for them to consider her rejection to be her resignation from Hamilton-Ryker.

Shortly thereafter, on July 6, 2004, in light of the elimination of Keymon's job position and her rejection of the new position, Hamilton-Ryker Vice President Kelly McCreight ("McCreight") met with Keymon to discuss Keymon's employment status. At the meeting, Keymon and McCreight agreed that Keymon would be temporarily laid off for a ninety-day period, effective Monday July 12, 2004 until Friday October 8, 2004. McCreight told Keymon that her last day of work before the temporary layoff commenced would be Friday July 9, 2004. They agreed that, during the temporary layoff, Hamilton-Ryker would try to find a position for Keymon at one of Hamilton-Ryker's other locations that would require less travel. If no such position could be found, they agreed, then they would discuss a permanent layoff in October 2004. As McCreight would be supervising Hamilton-Ryker's Memphis facility during Keymon's temporary layoff, Keymon agreed to assist McCreight's transition into that role.

On the morning of Saturday July 10, 2004, Keymon told Hoing by telephone that Hamilton-Ryker had laid her off. In that telephone conversation, Keymon and Hoing agreed that Keymon would take over the telephone directory preparation work that Hamilton-Ryker had been performing for Verizon. Hoing then contacted Terri Janak at Verizon. Janak was not pleased that Hamilton-Ryker had laid off Keymon and agreed that Oasis, with Keymon, would perform Verizon's telephone directory preparation work.

Later in the afternoon of July 10, 2004, Keymon utilized her Hamilton-Ryker email address to email approximately fifty-six documents concerning Hamilton-Ryker's work for Verizon to Keymon's personal email address. The documents included Verizon's anticipated production schedule for all of 2004, a profit-loss analysis for the completed projects, Verizon's mail address listings converted into a format capable of being printed as labels, and Hamilton-Ryker's invoices to Verizon for the June and July 2004 projects. Within the next several days, Keymon's Hamilton-Ryker email account was terminated.

Shortly thereafter, on July 16, 2004, Keymon began billing Hoing for directory preparation work performed under Oasis's agreement with Verizon. Twelve days later, on July 26, 2004, Janak emailed McCreight at Hamilton-Ryker to inform him that Verizon would no longer utilize Hamilton-Ryker for its directory preparation needs. In the email, Janak told McCreight simply that Verizon had "decided to pursue another avenue for [its] mailings."

During this time-frame, Keymon began drawing unemployment benefits for her layoff from Hamilton-Ryker. Hamilton-Ryker was unaware of Keymon's arrangement with Oasis and Verizon.

Throughout the term of Keymon's three-month layoff from Hamilton-Ryker, she billed Hoing for work performed for Verizon. Initially, Keymon billed Hoing under "Adams & Associates," a business entity created by her then-husband Anthony Adams[4] for his private investigation work. Keymon later established an entity called Keymon Management Group for the purpose of billing Hoing and Oasis for the Verizon work. Eventually, Keymon hired employees to assist her with the Verizon work; these workers included some Hamilton-Ryker employees at the Memphis facility who had worked on Hamilton-Ryker's directory preparation for Verizon under Keymon's supervision. Initially, Keymon only attached mailing labels to Verizon's directories, the same work Hamilton-Ryker had been doing for Verizon. After a while, Keymon began taking on tasks that Hamilton-Ryker had not performed for Verizon, such as data entry and field checking by making telephone calls to customers to confirm receipt of the directories.

---

[4]During the pendency of the instant lawsuit with Hamilton-Ryker, Keymon and Adams divorced.

At the end of the three-month temporary layoff period, Keymon and Hamilton-Ryker did not reach an agreement for Keymon to return to Hamilton-Ryker. Consequently, as they had discussed, they agreed to sever the employment relationship. Thus, on October 22, 2004, Keymon executed a severance agreement in which she agreed to sever her employment and release all claims against Hamilton-Ryker ("Severance Agreement"). In consideration, under the Severance Agreement, Keymon was to receive a total of $6000, to be paid by Hamilton-Ryker in bi-weekly installments. The Severance Agreement stated that it did "not revoke, supersede, replace or modify any prior agreements and understandings between [Hamilton-Ryker] . . . and [Keymon] concerning restrictive covenants, non-disclosure of information, non-solicitation of clients or non-competition with [Hamilton-Ryker]" and specifically referenced Keymon's Employment Agreement.[5] In the Severance Agreement, Keymon also agreed to fully cooperate with Hamilton-Ryker in any investigation into a breach of an employment agreement, by another employee or by Keymon herself, including an investigation "concerning the wrongful diversion of business, interference with a contractual relationship and breach of the duty of loyalty." Thereafter, Hamilton-Ryker deposited into Keymon's bank account, by direct deposit, the first bi-weekly payment due to Keymon under the Severance Agreement.

At some point, Hamilton-Ryker became aware that Keymon might be doing the mail preparation work on Verizon's telephone directories that Hamilton-Ryker had previously been performing. Therefore, on November 11, 2004, in accordance with the terms of Keymon's Severance Agreement, Hamilton-Ryker's attorney sent a letter to Keymon requesting her cooperation with its investigation into a possible breach of the terms of an employment agreement with an unidentified employee or former employee. The letter sought, among other things, copies of Keymon's cellular phone bills. Although Keymon produced to Hamilton-Ryker some of the requested documents, Hamilton-Ryker believed that Keymon had not produced all of the documents it sought. Moreover, Keymon forwarded to Hamilton-Ryker a check for $1157.56, made payable to Hamilton-Ryker, in an apparent attempt to return the first payment made to her under her Severance Agreement. Hamilton-Ryker returned the uncashed check to Keymon.

On February 5, 2005, Hamilton-Ryker filed the instant lawsuit against Keymon, alleging breach of contract. In the initial complaint, Hamilton-Ryker alleged only that Keymon failed to produce to Hamilton-Ryker the documents it requested, and thus had breached the provisions in her Severance Agreement requiring her to fully cooperate with the company's investigation. Keymon's answer denied that she had breached the Severance

---

[5]The Severance Agreement refers to the Employment Agreement as an attachment. However, the copy of the Severance Agreement in the appellate record does not have a copy of any employment agreement between Keymon and Hamilton-Ryker attached as an exhibit.

Agreement, and claimed that she had produced the documents that Hamilton-Ryker requested. Later, when Hamilton-Ryker refused to make payments to Keymon under the Severance Agreement, Keymon amended her answer to include a counterclaim for breach of the Severance Agreement. Discovery, and discovery disputes, ensued.

During the course of discovery, Hamilton-Ryker learned of the on-going business arrangement among Keymon, Oasis and Verizon. Hamilton-Ryker also made contact with Keymon's by-then estranged husband, Anthony Adams. As a result, Hamilton-Ryker amended its complaint to state claims against Keymon based on the work she performed after being laid off from Hamilton-Ryker, related to the Verizon telephone directories. Hamilton-Ryker alleged that Keymon had breached the noncompete covenant and the confidential information clause of her Employment Agreement by using Hamilton-Ryker's confidential information after her layoff, and by soliciting business from Hamilton-Ryker customers Oasis and Verizon. Hamilton-Ryker alleged that Keymon violated the Uniform Trade Secrets Act ("Trade Secrets Act" and, alternatively, "Act"), codified at Tennessee Code Annotated § 47-25-1701 *et seq.*, by emailing the Verizon-related Hamilton-Ryker documents to herself at her personal email address. Asserting that Keymon's conduct was willful and malicious, Hamilton-Ryker sought exemplary damages under the Trade Secrets Act, section 47-25-1704(b). Hamilton-Ryker also included claims for violation of Tennessee Code Annotated § 47-5-109 by inducing breach of contract; intentional interference with business relationships; breach of trust; breach of the duty of loyalty; breach of fiduciary duty; conversion; breach of duty against self dealing or corporate opportunity doctrine; and unjust enrichment.

Keymon answered Hamilton-Ryker's amended complaint by denying the allegations. The case was set for a bench trial.

During the pendency of the litigation, Keymon continued to perform the mail preparation work for Hoing and Oasis on the Verizon telephone directories. By the date of the trial, Keymon had billed approximately $1,450,388 for her Verizon-related work.

The trial was conducted on March 4, 2008. In the proceedings, the trial court heard testimony from Hamilton-Ryker Vice President Kelly McCreight; Hamilton-Ryker co-owner Crawford Gallimore; Keymon's ex-husband Anthony Adams; Oasis owner Hoing; and Keymon. Nineteen exhibits were entered into evidence, including Keymon's cellular phone records and Keymon's invoices to Oasis and Verizon.

At the outset, McCreight gave the trial court background about Keymon's employment with Hamilton-Ryker. In the course of her work, McCreight testified, Keymon developed relationships with clients, and in particular she was Hamilton-Ryker's

representative for the Oasis and Verizon work. McCreight said that Keymon did a "fantastic job" as a manager and "knew how to get the most out of the workers." He explained that Hamilton-Ryker's elimination of Keymon's job position was not an effort to get rid of her, because they valued her work. McCreight said that Hamilton-Ryker created the new position for Keymon to minimize her travel and thereby allow her to be more efficient. He said that, despite Keymon's initial rejection of the new position, Hamilton-Ryker's management hoped that she would eventually accept it during the temporary layoff period.

During his testimony, McCreight reviewed the Verizon-related documents that Keymon emailed to her personal email address on the afternoon of July 10, 2004. He stated that the documents included "pretty much everything that was needed to service [the Verizon] account." He observed that the documents included Verizon's list of mailing addresses that had been reformatted using Hamilton-Ryker's computer software, so that they could be printed as mailing labels. McCreight testified that Hamilton-Ryker considered the information in the documents to be confidential and took steps to limit access to the information. These steps included using a company server that was protected by a firewall to prevent outside access to the information. Additionally, Hamilton-Ryker permitted employees to access only the documents needed by the employee to complete his job. Moreover, Hamilton-Ryker's employment agreements routinely included a confidential information clause designed to prevent dissemination of the information. Finally, McCreight testified that the documents in Keymon's email included much more information than was needed for Keymon to assist McCreight in completing Hamilton-Ryker's invoices to Verizon for July 2004.

Keymon's ex-husband, Anthony Adams, testified about overhearing Keymon's telephone conversations with Hoing after Hamilton-Ryker laid her off, as well as Keymon's work for Hoing and Verizon thereafter. Adams testified that, on Friday, July 9, or Saturday, July 10, 2004, he overhead a cell phone conversation between Keymon and Hoing in which Keymon informed Hoing that she had been laid off. In the conversation, Adams said, Keymon agreed with Hoing to take over the Verizon telephone directory work and move it to Hoing's facility. After that, Adams said, he and Keymon "processed books, printed labels, did shipping of books. The same thing that they were doing at Hamilton-Ryker." While Keymon was drawing unemployment benefits, she billed Oasis for the Verizon work under his company, Adams & Associates. Adams testified, at some point, that he and Keymon began doing additional work for Oasis and Verizon, such as checking to see that the telephone directories had been properly delivered. Later, Adams said, Keymon hired temporary associates from Hamilton-Ryker to assist with the Verizon work.

Hamilton-Ryker called Mark Hoing to testify.[6] Hoing testified about his business relationship with Keymon. Hoing said that Hamilton-Ryker had done a good job of processing the Verizon telephone directories. His sole contact with Hamilton-Ryker, Hoing said, was Keymon. Hoing testified that Keymon called him to inform him that Hamilton-Ryker laid her off. Referring to Verizon's telephone directory work, Hoing said, he and Keymon "sat down and basically said that we would take it in-house. Talked that over with Verizon; and that's what we did, we brought it in-house." After that, Keymon performed the same work for Verizon that Hamilton-Ryker had been performing. Later, Keymon performed other tasks related to Verizon as well, such as work in telecommunications.

Crawford Gallimore, co-owner of Hamilton-Ryker, testified about Hamilton-Ryker's damages resulting from Keymon's conduct. Prior to being laid off, Gallimore said, Keymon had prepared a profit analysis for Hamilton-Ryker's work on the Oasis and Verizon account. The profit analysis showed that, on average, Hamilton-Ryker made a 32.9% profit on each directory processing project. To determine Hamilton-Ryker's lost profits, he applied this profit percentage to the actual amounts Keymon billed Oasis and Verizon after Hamilton-Ryker lost the account. Using this method, Gallimore calculated that Hamilton-Ryker had lost $94,307 in profits from July 2004 until October 2005, that is, the three-month term of the temporary layoff plus the one-year term of the noncompete covenant measured from the date of the Severance Agreement. Gallimore calculated that Hamilton-Ryker lost $477,178 in profits during the time period from July 2004 until the date of trial.

Keymon then testified on her own behalf. Keymon acknowledged signing an employment agreement that included a noncompete clause.[7] She said that she had told Hamilton-Ryker that she was unhappy with the amount of travel she was doing in her job. When Hamilton-Ryker eliminated her job position and offered her a new position, she said, she perceived that the new job would require even more travel of her. Consequently, she said, she rejected the new position and thus was left without a job.

After she got laid off, Keymon said, she continued to do "a little bit" of work for Hamilton-Ryker, namely, processing some Verizon invoices for them. Keymon stated that she emailed the Verizon documents from her Hamilton-Ryker email address to her personal email account in order to create billing invoices for Hamilton-Ryker. Shortly after that, Hamilton-Ryker terminated her work email account access.

---

[6]At the time of trial, Hoing was working for an air freight company called Seko.

[7]Keymon argued that the noncompete prohibited her from performing "staffing services," but the work she was doing for Verizon was "outsourcing" and thus not prohibited under the non-compete clause. This argument was rejected by the trial court and is not raised as an issue on appeal.

Keymon then related her version of her conversation with Mark Hoing after she was laid off from Hamilton-Ryker. Keymon said that Hoing contacted her, and that the contact occurred several days after her layoff:

> Q. . . . Now, after you went on temporary layoff, . . . how did the conversation come up between you and Mark Hoing?
>
> A. Mark Hoing called me a few days after my layoff and asked if I would be interested in helping him do some – with the hand delivery side of it, do some field operations, management, some data entry, help him with his standard operation manual, and that sort of thing.
>
> And I said, "Well, I'm not with Hamilton-Ryker any more."
>
> And so that's how that proceeded.

Keymon testified that she agreed to do the work because she was no longer employed by Hamilton-Ryker, and Hoing did not ask her to do the address labels for Verizon's telephone directories.[8] Hamilton-Ryker, Keymon said, had done only mailing labels for the Verizon telephone directories. The work she invoiced to Oasis, she asserted, was for work that had nothing to do with mailing labels, namely, hand-delivery, computer work, data entry, telechecking and field checking, and thus did not violate her noncompete agreement. Keymon conceded that she hired a couple of Hamilton-Ryker employees to assist her, but said that she thought that they maintained their jobs with Hamilton-Ryker and worked with Keymon "in the evenings."

At the conclusion of the proof, the trial court issued an oral ruling. It found that "by the overwhelming preponderance of the proof" Keymon was liable to Hamilton-Ryker on all claims asserted against her. In its oral ruling, the trial court awarded Keymon a judgment of $6000 on her counterclaim on the Severance Agreement, but took under advisement the issue of the damage award to be made against Keymon in favor of Hamilton-Ryker.

On April 7, 2008, the trial court entered a written order restating its prior oral ruling and awarding damages. At the outset, the trial court rejected Keymon's argument that the

_____

[8]Keymon also asserted that Verizon was Hamilton-Ryker's customer, but that Hoing was not a customer of Hamilton-Ryker. Because she was paid by Hoing's company, Oasis, and was not paid directly by Verizon, Keymon argued, she did not solicit one of Hamilton-Ryker's "customers" and thus was not in breach of her noncompete. This argument was also rejected by the trial court and is not raised as an issue on appeal.

noncompete agreement was not enforceable because it did not contain a geographic boundary. The trial court stated that Keymon's "actions occurred in an existing area with an existing client or customer, and as such, the absence of a geographic boundary is of no issue." The trial court then went on to find:

11. The Defendant also, while she was employed by the Plaintiff, downloaded data from her company computer to her home computer which contained an expandable folder full of confidential, proprietary and trade secrets information of the Plaintiff.

12. The argument by the Defendant that the information was needed for the purpose of invoicing is without merit, as the time line and all the facts and circumstances require the Court—having observed the witness testimony first-hand—to conclude that the information was used to improperly go into a competing business against the Plaintiff.

13. Shortly after the Defendant improperly downloaded the confidential, proprietary and trade secrets information of the Plaintiff, the Defendant was temporarily laid-off by the Plaintiff.

14. Shortly after this time, the Defendant's customers, Verizon and Oasis (Mr. Hoing's company), terminated their business relationships with the Plaintiff.

15. As soon as the Defendant was temporarily laid-off by the Plaintiff, the Defendant began providing the very same staffing services to Verizon and Oasis (Mr. Hoing's company) that the Plaintiff had provided to these entities during the Defendant's employment with the Plaintiff, and which the Defendant handled for the Plaintiff.

16. The Court finds that the cause of the termination of the contract and business relationship between the Plaintiff and its customers, Verizon and Oasis (Mr. Hoing's company), were the direct and intentional actions of the Defendant to solicit and appropriate the contracts and business for her own personal benefit.

17. The actions of the Defendant in intentionally soliciting and appropriating the contracts and business of Verizon and Oasis (Mr. Hoing's company) were taken no later than July 10, 2004, during which time the Plaintiff was still an active employee of the Plaintiff.

18.  Furthermore, the improper downloading of the confidential, proprietary and trade secrets information of the Plaintiff by the Defendant occurred mere hours after the Defendant intentionally solicited and appropriated the contracts and business of Verizon and Oasis (Mr. Hoing's company).

19.  As such, the Court finds that by the overwhelming preponderance of the proof in this case—having personally observed the witness testimony—that the Defendant has breached her contractual, common law and statutory duties owed to the Plaintiff.

The trial court awarded Hamilton-Ryder, *inter alia*, $94,307 for breach of the Employment Agreement and $48,283.20 in attorney's fees under the Employment Agreement.  It also found that Keymon procured Verizon's breach of its contract with Hamilton-Ryker, in violation of Tennessee Code Annotated § 47-50-109.  The damages for this offense were also $94,307, and these were trebled under the statute, for a total award under section 47-50-109 of $282,921.  The trial court found that Hamilton-Ryker's total actual damages were $477,178, resulting from Keymon's intentional interference in Hamilton-Ryker's business relationships with Oasis and Verizon, Keymon's breach of her common law and contractual duties of loyalty, trust and obligation to refrain from self-dealing, Keymon's conversion of Hamilton-Ryker's assets, and Keymon's unjust enrichment. Under the Trade Secrets Act, the trial court found that Hamilton-Ryker's actual damages were, again, $477,178.  Pursuant to section 47-25-1704(b), this amount was doubled as exemplary damages, due to the willful and malicious nature of Keymon's conduct, for a total award of $954,356.  After setting forth the damages for each claim, the trial court awarded a judgment in favor of Hamilton-Ryker in the amount of $948,356 as damages for all causes of action, after offsetting Keymon's $6000 award under the Severance Agreement.  From this judgment, Keymon now appeals.[9]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Keymon presents the following issues:

---

[9]After Keymon filed her notice of appeal, she filed a motion in this Court to remand to the trial court for consideration of her motion to set aside the trial court's final order pursuant to Rule 60.02 of the Tennessee Rules of Civil Procedure.  In the Rule 60.02 motion, Keymon alleged that the testimony of her ex-husband Adams had been procured through fraud, allegedly based on a secret agreement with Hamilton-Ryker for Adams to provide favorable testimony in exchange for a promise not to sue.  The case was remanded to the trial court for consideration of Keymon's Rule 60.02 motion.  The trial court rejected the motion as based on hearsay evidence. The trial court also concluded that the weight of the evidence supported the final order even if Adams's testimony were stricken.

1) Whether the trial court erred in upholding and enforcing all provisions of the Employment Agreement or whether the entire Employment Agreement, or certain provisions of the Employment Agreement, should have been held unenforceable pursuant to law or public policy;

2) Whether Keymon breached any duty owed to Hamilton-Ryker;

3) Whether the trial court erred in the calculation of damages by awarding damages for nearly four years anticipated profits and by doubling alleged actual damages for exemplary damages;

4) Whether the finding of unjust enrichment should be set aside;

5) Whether the trial court erred in holding that damages awarded to Hamilton-Ryker for inducing breach of contract should be trebled in accordance with Tennessee Code Annotated § 47-50-109; and

6) Whether the trial court erred in refusing to grant Keymon additional time to conduct further investigation and formal discovery in support the Rule 60.02 motion to set aside judgment, especially given the lack of notice on the motion hearing.

As this case was tried by the trial court sitting without a jury, we review the trial court's findings of fact *de novo* with a presumption of correctness unless the evidence preponderates to the contrary. TENN. R. APP. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). "The trial court's credibility assessments are entitled to great weight on appeal, because the court had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Columbus Med. Servs., LLC v. Thomas*, No. W2008-00345-COA-R3-CV, 2009 WL 2462428, at *14 (Tenn. Ct. App. Aug. 13, 2009), *no perm. app.* (citing *C&W Asset Acquisition, LLC v. Oggs*, 230 S.W.3d 671, 676 (Tenn. Ct. App. 2007)). The trial court's conclusions of law are reviewed *de novo* without a presumption of correctness. *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993)).

**ANALYSIS**

**Covenant Not to Compete**

Keymon first contends that the trial court erred in enforcing the covenant not to compete in her Employment Agreement. She asserts that the lack of any geographic limitation in the noncompete clause makes its restrictions unreasonably broad, and thus renders it unenforceable.[10] The trial court held that the lack of any geographical boundary in the noncompete clause was "of no issue" because Keymon's conduct occurred in the same geographic area in which she worked for Hamilton-Ryker, with an existing customer.

In general, "covenants not to compete are disfavored in Tennessee but will be enforced if 'they are deemed reasonable under the particular circumstances.' " *Columbus Med. Servs., LLC*, 2009 WL 2462428, at *14 (quoting *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)). Therefore, the reasonableness of the noncompete provision, and thus its enforceability, is not evaluated in the abstract; rather, it is determined in the context of the circumstances presented in the case before the court.

In general, one of the factors to be considered in determining the reasonableness of a covenant not to compete is whether the territorial limitations in the covenant are reasonable. *Columbus Med. Servs., LLC*, 2009 WL 2462428, at *15 (quoting *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005)). The "territorial limits must be no greater than necessary to protect the business interest of the employer." *Id.* (quoting *Udom*, 166 S.W.3d at 678).

In some cases, however, a restriction against soliciting the employer's customers can in effect substitute for a geographic limitation, by stating the impermissible actions of the employee by other means. For example, in *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743 (Tenn. Ct. App. 1987), the defendant accountant's employment agreement with the plaintiff accounting partnership included a covenant not to compete. *Id.* at 743-44. The covenant prohibited the accountant from soliciting the partnership's clients for three years after termination of his employment. *Id.* The covenant had no territorial limitation. *See id.* After leaving the accounting partnership, the accountant solicited and

---

[10]At trial, Keymon also contended that the noncompete covenant was unenforceable because she was already employed when Hamilton-Ryker asked her to sign it, and thus it failed for lack of consideration. The trial court correctly held that Keymon's continued employment was adequate consideration for the noncompete agreement. *See Cummings, Inc. v. Dorgan*, No. M2008-00593-COA-R3-CV, 2009 WL 3046979, at *17 (Tenn. Ct. App. Sept. 23, 2009), *no perm. app.* (citing *Ramsey v. Mut. Supply Co.*, 427 S.W.2d 849, 852-53 (Tenn. Ct. App. 1968)). This was not raised as an issue on appeal.

began providing accounting services to twenty of the partnership's current clients. *Id.* at 744. The partnership sued the accountant to enforce the noncompete clause in the employment contract. *Id.* at 743. The trial court held that the covenant was unenforceable, in part because it did not include a territorial limitation. *Id.* at 744. The employer appealed. On appeal, this Court held that an employer has a legitimate protectable business interest in its current clients. It found that the omission of a territorial limitation in the noncompete covenant was not fatal. *Id.* at 745-46. The Court explained:

> Rather than being limited by geographic boundaries, [Bowlin] is only prohibited from soliciting the business of and working for a specific group of persons, the Partnership's clients . . .. Bowlin knew who these clients were . . .. "[A]s the specificity of limitation regarding the class of person [sic] with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases."

*Id.* (quoting ***Seach v. Richards, Dieterle & Co.***, 439 N.E.2d 208, 213 (Ind. Ct. App. 1982)). The appellate court concluded that the restraint on the employee was reasonably commensurate with the goal of protecting the employer's legitimate business interest, and thus that the covenant not to compete was enforceable. *Id.* at 746.

As in ***Bowlin***, although the noncompete provision in Keymon's Employment Agreement did not state a territorial limitation, it prohibited her from soliciting business from entities who were customers of Hamilton-Ryker with whom Keymon did business on behalf of Hamilton-Ryker. The actions that were prohibited after Keymon's termination were clearly delineated by this limitation, and the restraint on Keymon was reasonable under the circumstances. Thus, we agree with the conclusion of the trial court and affirm its holding that the covenant not to compete in Keymon's Employment Agreement was enforceable.

### Trade Secrets Act

The largest award of damages against Keymon was made pursuant to Tennessee's Uniform Trade Secrets Act, Tennessee Code Annotated §§ 47-25-1701 to -1709. The damage awards under other legal theories were subsumed within the Trade Secrets Act damage award. Therefore, we consider next the issues raised on appeal under the Trade Secrets Act.

On appeal, Keymon contends that the Verizon-related information she emailed to her personal email address on July 10, 2004 did not constitute a "trade secret" within the meaning of the Trade Secrets Act. She argues that the trial court erred in finding that her actions were "willful and malicious" under the Trade Secrets Act, which was the basis for

the trial court's award of exemplary damages. Finally, she asserts that the trial court erred in its calculation of damages pursuant to the Trade Secrets Act.

## *Overview*

Under Tennessee's common law, a plaintiff business could assert a claim for misappropriation of a trade secret if the plaintiff proved the following elements:

> (1) the existence of a trade secret; (2) communication of that trade secret to the defendant while the defendant was in a position of trust and confidence; (3) use of the trade secret; and (4) damage to the plaintiff.

Douglas F. Halijan, *The Past, Present, and Future of Trade Secrets Law in Tennessee: A Practitioner's Guide Following the Enactment of the Uniform Trade Secrets Act*, 32 U. MEM. L. REV. 1, 9 (2001) (citing *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 586 (Tenn. Ct. App. 1979)).[11] In particular, employees are "bound by the general duty not to disclose confidential information or trade secrets belonging to the former employer; violation of this duty gives rise to a cause of action in the employer to obtain relief against the former employee." *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 588 (Tenn. Ct. App. 2001) (citing *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941-42 (Wash. 1999)).

Under the common law, a trade secret was defined as "any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Id.* (quoting *Hickory Specialties, Inc.*, 592 S.W.2d at 586). Tennessee cases "used the terms 'trade secret' and 'confidential information' interchangeably, holding that confidential business information such as customer lists, knowledge of the buying habits and needs of particular clients, and pricing information, was protectable only to the extent that it satisfied the definition of a trade secret." Halijan, *supra,* at 13; *see Grisoni*, 135 S.W.3d at 588 ("Confidential information is closely analogous to a trade secret and warrants similar protection."). To determine whether the trade secret or confidential information was protectable, courts considered factors such as the measures taken by the business to guard the secrecy of the information, the value of the information, and the ease with which it could be duplicated or acquired by others. Halijan, *supra*, at 9 (citing *Venture Express, Inc. v. Zilly*, 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)).

---

[11]The Halijan article in the University of Memphis Law Review provides an excellent overview of Tennessee's Uniform Trade Secrets Act.

Enacted in 2000, Tennessee's Trade Secrets Act "preempts and displaces conflicting or inconsistent common law in Tennessee regarding the misappropriation of trade secrets." *Id.* at 5 (citing T.C.A. § 47-25-1708(a) (Supp. 2000)). The Act provides that a plaintiff may obtain injunctive relief and/or an award of damages for "misappropriation" of a "trade secret" as those terms are defined in the Act. *See* T.C.A. § 47-25-1702(2), (4) (providing definitions of "misappropriation" and "trade secret," respectively); T.C.A. § 47-25-1703 (providing for injunctive relief); T.C.A. § 47-25-1704 (providing for damages).

The term "misappropriation" has multiple definitions under the Trade Secrets Act. The definition most applicable to the case at bar is the following: "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." T.C.A. § 47-25-1702(2)(A) (2001). The term "trade secret" has a statutory definition that is similar to the common law definition:

> [I]nformation, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

T.C.A. § 47-25-1702(4) (2001). The Tennessee legislature adopted the definition of "trade secrets" under the Uniform Trade Secrets Act, and also adopted additions which make Tennessee's definition even broader than the definition in the Uniform Act. Specifically, "Tennessee's definition of 'trade secret' includes any information 'without regard to form, including, but not limited to, technical, nontechnical or financial data.' " Halijan, *supra*, at 21. Tennessee's definition "also adds the word 'plan' to the non-exclusive list of information and items that may constitute a trade secret." *Id.* at 21-22. Thus, the definition of a "trade secret" under the Act is sufficiently broad to include information which at common law would have been considered confidential information. In contrast to the common law, for the information to be protectable under the Trade Secrets Act, the business need only show "reasonable" efforts to maintain the secrecy of the information. *Id.* at 21.

Notably, under the Trade Secrets Act, the damages recoverable for the misappropriation of a trade secret "can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." T.C.A. § 47-25-1704(a) (2001). If the court finds that

-18-

the misappropriation was "willful and malicious," it may award "exemplary damages" by doubling the award of damages. T.C.A. § 47-25-1704(b) (2001).

## *Trade Secret*

On appeal, Keymon asserts that she did not make use of any information that would constitute a "trade secret." She does not dispute that she sent to her personal email address a variety of Verizon-related documents and information. She argues, however, that she could have easily obtained the same information directly from Verizon, and that the process of assisting Verizon in preparing its telephone directories for distribution constituted general knowledge that was well known or easily ascertainable.

In the case at bar, Keymon emailed herself fifty-six documents pertaining to Hamilton-Ryker's work on the Oasis and Verizon account. These documents included Verizon's anticipated production schedule for the remainder of the calendar year, Hamilton-Ryker's internal profit analysis of the work, mailing addresses from Verizon that had already been reformatted with Hamilton-Ryker's computer software to be printed as mailing labels, and Hamilton-Ryker's invoices for its most recent work on the Verizon account. McCreight testified that these documents contained everything needed to service the Verizon account. The trial court found that Keymon had emailed to herself "an expandable folder full of confidential, proprietary and trade secrets information" of Hamilton-Ryker.

Regardless of whether Keymon could have acquired the mailing addresses directly from Verizon, the aggregate of the information that Keymon emailed to herself may be considered a trade secret. Even if Keymon could have obtained "individual pieces of information" by other means, the integration and aggregation of it may be deemed confidential or a trade secret. *See Grisoni*, 135 S.W.3d at 589 (quoting *Essex Group, Inc. v. Southwire Co.* 501 S.E.2d 501, 503 (Ga. 1998)). Moreover, even if the information could have been developed by independent means, "it may be protectible if the former employee does not develop it by independent [means] but in fact obtains his knowledge . . . from his former employer and then uses this knowledge to compete with the former employer." *Id.*

As noted by the trial court, the speed with which Keymon utilized this information to begin competing directly with Hamilton-Ryker - a mere six days elapsed between the acquisition of the information and the commencement of billable work by Keymon - demonstrates its independent economic value. Moreover, Keymon benefitted from the use of Hamilton-Ryker's software, inasmuch as the mailing addresses obtained from Verizon had been reformatted so as to be printed on mailing labels, to be affixed to Verizon's telephone directories. Further, the documents included Verizon's anticipated production schedule and the details of Hamilton-Ryker's invoices to Verizon. On the element of secrecy, McCreight

testified that Hamilton-Ryker took steps to keep the information confidential, including use of a firewall-protected server, confidentiality agreements with employees, and limitations on the employees' electronic access to documents.

Considering the aggregate of the information in the Verizon-related documents that Keymon emailed to herself, we must conclude that it meets the definition of a "trade secret" under Tennessee Code Annotated § 47-25-1702(4).

### *Willful and Malicious Misappropriation*

Keymon next contends that the trial court erred in finding that she acted willfully and maliciously in misappropriating Hamilton-Ryker's trade secrets, the finding that supports the trial court's award of exemplary damages under Tennessee Code Annotated § 47-25-1704(b). Keymon argues that "willful and malicious" in the Trade Secrets Act should be interpreted to include an element of "hatred, ill will or spite," similar to the "malice" standard for an award of punitive damages. She also maintains that the record is devoid of evidence showing that she acted with ill will, hatred or spite.

As noted above, Tennessee Code Annotated § 47-25-1704(b) provides for an award of exemplary damages in the event that "willful and malicious misappropriation exists." T.C.A. § 47-25-1704(b) (2001). The Trade Secrets Act does not include a statutory definition of "willful and malicious." *See* T.C.A. § 47-25-1702 (2001) ("Definitions"). Neither party cites a Tennessee case interpreting the phrase "willful and malicious" in the context of the Trade Secrets Act, and we have found none.

In the absence of any Tennessee cases interpreting the Trade Secrets Act on this point, Keymon cites *Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3-CV, 2004 WL 2218574 (Tenn. Ct. App. Sept. 30, 2004). In *Prime Co.*, the Court held that the proper definition of "malice" in a procurement of breach of contract case is "wilful violation of a known right." *See id.* at *4 (citing *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept. 24, 1998)). The Court referred to the definition of "malice" applicable to an award of punitive damages, namely: "hatred, ill will or spite." *Id.* From this, Keymon submits that "willful and malicious" as used in the Trade Secrets Act with respect to an award of exemplary damages should be interpreted to include "hatred, ill will or spite."

In response, Hamilton-Ryker points to case law from other jurisdictions interpreting the "exemplary damages" provision in the Uniform Trade Secrets Act. These cases differentiate "exemplary damages" in the Uniform Act from traditional punitive damages. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1111-12 (9th Cir. 2001)

-20-

("We conclude that the Montana legislature did not incorporate the definition of punitive damages into the trade secrets act."); ***Zawels v. Edutronics, Inc.***, 520 N.W.2d 520, 523-524 (Minn. Ct. App. 1994); ***McFarland v. Brier***, 769 A.2d 605, 611-612 (R.I. 2001). While not binding on this Court, the interpretation given to a provision of a uniform act by other jurisdictions is highly persuasive. ***See Dewitt v. Al-Haddad***, No. 89-394-II, 1990 WL 50727, at *4 (Tenn. Ct. App. Apr. 25, 1990) (quoting ***Holiday Inns, Inc. v. Olsen***, 692 S.W.2d 850, 853 (Tenn. 1985) ("While opinions by courts of sister states construing a uniform act are not binding upon this court, we are mindful that the objective of uniformity cannot be achieved by ignoring utterances of other jurisdictions."). Moreover, the legislature has stated expressly that the Act should be construed "to effectuate its general purpose to make consistent the law . . . among states enacting it." T.C.A. § 47-25-1709 (2001). We are persuaded by these cases that the standard for exemplary damages under the Trade Secrets Act should be interpreted differently from the traditional standard for punitive damages so as not to require a finding of "hatred, ill will or spite."

Here, the evidence shows that the day after Keymon's last day of work for Hamilton-Ryker, she contacted Hoing for the express purpose of soliciting the Verizon work. Immediately after that, she emailed herself Hamilton-Ryker's trade secret information on the Verizon account. Clearly, this was to enable Keymon to step in and immediately begin performing for Verizon the same services that Hamilton-Ryker had been providing. The trial court brushed aside Keymon's assertion that she emailed the information to herself in order to assist Hamilton-Ryker in getting invoices to Verizon, finding her argument to be "without merit." This is fully supported by the evidence in the record. Thus, while drawing unemployment compensation and accepting severance payments, Keymon was surreptitiously utilizing Hamilton-Ryker's trade secret information to purloin Verizon's telephone directory business, even utilizing Hamilton-Ryker employees to do so. We must conclude that this conduct amounts to willful and malicious misappropriation under the Trade Secrets Act. Thus, the trial court did not err in awarding exemplary damages pursuant to Tennessee Code Annotated § 47-25-1704(b).

### *Damage Calculation*

Keymon contends that the trial court erred in calculating Hamilton-Ryker's damages. To determine Hamilton-Ryker's damages for Keymon's violation of the Trade Secrets Act, the trial court applied Hamilton-Ryker's 32.9% profit calculation to the entire $1,450,388 that Keymon actually billed Oasis and Verizon from July 2004 to the date of the trial. First, Keymon argues that it is too speculative to conclude that Hamilton-Ryker would have provided services to Oasis and Verizon during this nearly four year time period from Keymon's layoff to the date of trial. Next, Keymon argues that neither Gallimore, who testified as to Hamilton-Ryker's lost profits, nor Keymon, who calculated the 32.9% average

profit margin for Hamilton-Ryker's work for Verizon, were qualified as experts in business profit and loss analysis. Finally, Keymon asserts that the actual damage calculation of $477,178 for violation of the Trades Secrets Act is inconsistent with the actual damage calculation of $94,307 for inducement to breach the contract between Hamilton-Ryker and Oasis and Verizon.

As noted above, Tennessee's Trade Secrets Act authorizes the trial court to make an award of damages that includes both the plaintiff's "actual loss caused by misappropriation" and the defendant's "unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." T.C.A. § 47-25-1704(a) (2001). In other words, the trial court may, in its discretion, award the monies actually lost by the plaintiff because of the defendant's misappropriation; however, if the amount of the defendant's unjust enrichment is greater than the amount of the plaintiff's actual loss, the damage award may be increased up to the amount of the defendant's unjust enrichment.

Here, the trial court utilized the total amount that Keymon had billed Hoing and Oasis for her work on the Verizon telephone directories. It then applied the profit percentage Keymon calculated for Hamilton-Ryker's Verizon work. Regardless of whether Hamilton-Ryker would have continued doing Verizon's directory processing work during the nearly four-year time span from Keymon's layoff, this was a reasonable method to calculate the amount by which Keymon was unjustly enriched for the Verizon work she obtained by virtue of the trade secret information she misappropriated from Hamilton-Ryker. The award as calculated by the trial court did not require the use of expert testimony, and is in no way inconsistent with the calculation of Hamilton-Ryker's actual damages for Keymon's inducement of Oasis and Verizon to breach the contract with Hamilton-Ryker. We find that the trial court's calculation of damages under the Trade Secrets Act is fully supported by the evidence in the record.

### Denial of Motion to Set Aside Judgment

Keymon argues that the trial court erred in denying her Rule 60.02 motion to set aside the final judgment without allowing her additional time to conduct discovery.

Denial of a Rule 60.02 motion to set aside judgment is reviewed under an abuse of discretion standard. *Banks v. Dement Constr. Co., Inc.*, 817 S.W.2d 16, 18 (Tenn. 1991). Keymon's 60.02 motion was predicated upon a purported agreement between Adams and Hamilton-Ryker, under which Adams' favorable testimony was exchanged for Hamilton-Ryker's promise not to sue. In support of the motion, Keymon included an affidavit from James Bowles stating that Adams had informed Bowles of the purported agreement. The trial court denied the motion, finding that the affidavit contained inadmissible hearsay and

that the evidence supported the final judgment even if Adams' testimony were stricken. Furthermore, three years elapsed between the filing of the complaint and the trial date, and Keymon had ample time pending the trial to conduct discovery into this matter. We must conclude that the trial court did not abuse its discretion in denying Keymon's Rule 60.02 motion to set aside the judgment.

## CONCLUSION

In sum, we hold that Keymon's noncompete covenant was reasonable and enforceable even without a geographic limitation. We find that the Verizon-related information misappropriated by Keymon constituted a trade secret, and that the evidence supports the trial court's finding that her misappropriation was willful and malicious. We affirm the trial court's award of damages, and exemplary damages, under the Trade Secrets Acts. We affirm the trial court's denial of Keymon's Rule 60.02 motion. These holdings pretermit all other issues raised on appeal.

The decision of the trial court is affirmed. The costs of this appeal are taxed to the Appellant Tammy L. Keymon, and her surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE